UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

SECURITIES AND EXCHANGE COMMISSION,      )
                                          )
                          Plaintiff,      )    MAGISTRATE JUDGE _____
                                          )
              v.                          )    Civil Action No.
                                          )
WILLIAM M. BAKER,                         )
LAURENCE D. COHEN,                        )
FRANK D. EDWARDS,                         )    04    12444 DPW
CURTIS W. HOWES and                       )
MARK A. TATKOW,                           )
                                          )
                          Defendants.     )
                                          )
_____

RECEIPT # _____
AMOUNT $ _____
SUMMONS ISSUED  YES
LOCAL RULE 4.1 _____
WAIVER FORM _____
MCF ISSUED _____
BY DPTY. CLK. _____
DATE  11/18/04

**COMPLAINT**

Plaintiff Securities and Exchange Commission ("Commission") alleges the following against defendants William M. Baker, Laurence D. Cohen, Frank D. Edwards, Curtis W. Howes, and Mark A. Tatkow:

**SUMMARY**

1.    This enforcement action involves material overstatements of revenue and income by Robotic Vision Systems, Inc. ("Robotic"), a publicly-traded technology company then headquartered in Canton, Massachusetts, in two public filings with the Commission in 2000. On May 21, 2001, after an internal investigation, Robotic filed an amended annual report with the Commission which revealed that, for fiscal year 2000 (ended September 30), the company had overstated its revenue by 2.1% ($4.74 million) and its net income by 13.5% ($1.45 million). The

restatement also revealed that, for the third fiscal quarter of 2000 (ended June 30), Robotic had overstated its revenue by 3.4% ($2.1 million) and its net income by 9.7% ($517,000).

2.      The restatement of Robotic's financial results for 2000 was necessitated by the discovery of improper recognition of revenue at the company's Acuity CiMatrix ("ACIM") division. Between December 1999 and September 2000, ACIM negotiated numerous purported sales to its distributors which contained non-standard terms that deferred, conditioned or even negated the distributors' obligation to pay for the ACIM products. For example, the distributors often had no obligation to pay ACIM until they had sold the products to their own customers. Sometimes, the distributors received an absolute right to return the products to ACIM if they were unable to sell them (a right which the distributors frequently exercised). In other instances, the distributors took possession of the products with explicit instructions to deliver them to a designated end user who would actually pay ACIM, and the distributors received a "handling fee" or other credit in exchange for their agreement to take the products on an interim basis. Even though the distributors' obligation to pay ACIM was deferred, contingent or even non-existent (as in those deals where payment was to come from the designated end user), ACIM recognized revenue on the purported sales as soon as the product was shipped from its warehouse to the distributors. This premature recognition of revenue constituted a failure to comply with generally accepted accounting principles ("GAAP").

3.      Most of the non-standard deals were negotiated or approved by defendant Tatkow (Robotic's Senior Vice President of Worldwide Sales), who pressured his sales staff to induce ACIM's distributors to place such orders at the end of each quarter so that ACIM could meet its sales and revenue targets. The deals went undetected for months because ACIM's poor internal

2

controls provided Tatkow with authority to negotiate and approve deals with non-standard terms, and because ACIM's poor internal record-keeping failed to ensure that the non-standard terms were recorded in the company's computer system. The number of non-standard deals increased sharply during the third fiscal quarter of 2000 (ended June 30), coinciding with heightened pressure on ACIM to meet revenue expectations. As a result, Robotic's results for the third fiscal quarter, which were contained in a quarterly report to the Commission on Form 10-Q filed on August 12, 2000, were materially overstated. The improper deals continued in the fourth fiscal quarter of 2000 (ended September 30), including one transaction in which defendant Baker, the General Manager of ACIM's 2D unit, agreed with one of ACIM's distributors that the distributor's right to return the products would be omitted from the face of its purchase order so that Robotic could improperly book revenue from the transaction.

4.    Prior to September 2000, defendant Edwards (Robotic's Chief Financial Officer), defendant Cohen (Robotic's Corporate Controller), and defendant Howes (ACIM's Acting President) had become aware that some distributors were refusing to pay for ACIM products until they had sold the products to their own customers. After September 2000, ACIM's controller repeatedly informed Edwards, Cohen, Howes and Tatkow that certain ACIM deals contained non-standard terms that deferred, conditioned or eliminated the distributors' obligation to pay ACIM. In November 2000, after the fiscal year had ended but before Robotic filed its annual report to the Commission on Form 10-K, Edwards, Cohen, Howes and Tatkow continued to discuss the ACIM deals with non-standard terms, and they all knew or were reckless in not knowing that the recognition of revenue from such deals had been improper. Nevertheless, they did not correct the improper revenue recognition, nor did they inform Robotic's Board of

3

Directors, Audit Committee, or outside auditors of what they had learned. In fact, Edwards and Cohen failed to disclose to the auditors the presence of contingent sales to distributors.

5.    Through the activities alleged in this Complaint (and as set forth more fully below), the defendants violated numerous provisions of the federal securities laws: (a) Baker violated Section 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 13b2-1 thereunder, and he also aided and abetted Robotic's uncharged violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13a-13 thereunder; (b) Cohen violated Section 10(b) of the Exchange Act and Rule 10b-5 or, in the alternative, aided and abetted Robotic's uncharged violations of Section 10(b) and Rule 10b-5, and he also violated 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1 and 13b2-2 and aided and abetted Robotic's uncharged violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13; (c) Edwards violated Sections 10(b) and 13(b)(5) of the Exchange Act and Rules 10b-5, 13b2-1 and 13b2-2, and he also aided and abetted Robotic's uncharged violations of Section 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13; (d) Howes violated Section 13(b)(5) of the Exchange Act and Rule 13b2-1, and he also aided and abetted Robotic's uncharged violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13a-13; and (e) Tatkow violated Section 13(b)(5) of the Exchange Act and Rules 13b2-1 and 13b2-2, and he also aided and abetted Robotic's uncharged violations of Sections 10(b), 13(a), 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act and Rules 10b-5, 12b-20, 13a-1 and 13a-13.

6.     Accordingly, the Commission seeks:  (a) entry of a  permanent injunction prohibiting the defendants from further violations of the relevant provisions of the Exchange Act and the rules thereunder; (b) disgorgement of performance bonuses paid to Howes, Tatkow and Baker on the basis of the materially overstated revenue at ACIM, plus pre-judgment interest; (c) imposition of a civil penalty against each defendant; and (iv) entry of an order barring Edwards and Cohen from serving as an officer or director of a public company.

## JURISDICTION

7.     The Commission seeks a permanent injunction and disgorgement of ill-gotten gains pursuant to Section 21(d)(1) of the Exchange Act [15 U.S.C. §78u(d)(1)].  The Commission seeks the imposition of civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].  The Commission seeks an officer and director bar pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)].

8.     This court has jurisdiction over this action pursuant to Sections 21 and 27 of the Exchange Act [15 U.S.C. §§78u and 78aa].

## ROBOTIC

9.     **Robotic** is a Delaware corporation with its principal place of business in Nashua, New Hampshire.  During the period at issue in this Complaint, the corporate offices of Robotic, as well as the offices of its ACIM division, were located in Canton, Massachusetts. The ACIM division manufactures machine vision systems (*i.e.*, computer systems that inspect the shapes, colors, widths and heights of products and parts), lighting products, and bar code reading systems.  At all relevant times, Robotic's common stock was registered with the Commission

5

pursuant to Section 12(g) of the Exchange Act [15 U.S.C. §78l(g)] and was traded on the

NASDAQ National Market System. Pursuant to Section 13(a) of the Exchange Act [15 U.S.C.

§78m(a)] and Rules 13a-1 and 13a-13 thereunder [17 C.F.R. §§240.13a-1 and 240.13a-13],

Robotic was required to file with the Commission annual reports on Form 10-K and quarterly

reports on Form 10-Q. Pursuant to Rule 12b-20 [17 C.F.R. §240.12b-20], Robotic's annual and

quarterly reports were required to contain such material information as necessary to make the

required statements, in the light of the circumstances under which they were made not

misleading. Pursuant to Regulation S-X [17 C.F.R. §210.1-01 *et seq.*], Robotic's annual reports

were required to contain audited financial statements prepared in conformity with GAAP.

## DEFENDANTS

10.    **Baker**, age 55, lives in Westboro, Massachusetts. He joined Robotic in 1995

when Robotic acquired his previous employer. From 1999 through most of 2001, he served as

General Manager of ACIM's 2D unit. In June 2002, Robotic terminated his employment as part

of a series of corporate layoffs.

11.    **Cohen**, age 40, lives in Norfolk, Massachusetts. He joined Robotic in June 1999

as Corporate Controller. He is a licensed CPA in Massachusetts. In April 2003, he left Robotic.

12.    **Edwards**, age 50, lives in Holliston, Massachusetts. He joined Robotic in March

1999 as CFO. He is qualified as a "chartered accountant", the Canadian equivalent of a certified

public accountant ("CPA"). He resigned as Robotic's CFO in September 2001, approximately

four months after Robotic restated its financial results, but purportedly for unrelated reasons.

6

13.     **Howes**, age 53, lives in Harvard, Massachusetts. He joined Robotic in May 1997 as Vice President of Automatic Identification. Between July 1999 and January 2001, he was the Acting President of the ACIM division. Since January 2001, he has again held the position of Vice President of Automatic Identification.

14.     **Tatkow**, age 46, lives in Sudbury, Massachusetts. He joined Robotic in October 1997 as Vice President of Worldwide Sales. In February 2000, he was promoted to Senior Vice President of Worldwide Sales. He remained in that position until July 2001, when Robotic terminated his employment as a result of its internal investigation of this matter.

## STATEMENT OF FACTS

### Summary

15.     During fiscal year 2000 (October 1, 1999 through September 30, 2000), Robotic's ACIM division improperly recorded revenue from approximately 36 purported sales to distributors totaling approximately $4.73 million in order to meet its revenue and sales goals. While the improperly recorded sales began in the first fiscal quarter (ended December 31, 1999), the vast majority occurred in the second half of fiscal year 2000. During the third fiscal quarter (ended June 30, 2000), Robotic improperly recorded revenue from eleven deals totaling $1.97 million. During the fourth fiscal quarter (ended September 30, 2000), Robotic improperly recorded revenue from sixteen deals totaling $2.1 million.

16.     Recognizing revenue from these transactions was contrary to generally accepted accounting principles ("GAAP") because, as set forth below, the purported sales contained non-

7

standard terms whereby the distributor's obligation to pay ACIM for the products was deferred, contingent, or even non-existent.

## Robotic's Inadequate Internal Controls

17.    ACIM's poor internal controls and record-keeping systems made the improper accounting possible. Tatkow as Vice President and then Senior Vice President of Worldwide Sales had certain authority to negotiate and approve discounts, extended payment periods, and other non-standard terms. Although ACIM's controller repeatedly demanded to be notified about non-standard terms, Tatkow and the sales staff routinely failed to provide him with that information. In addition, Tatkow had certain authority to authorize product returns. Because product returns would result in the reversal of his (and his staff's) sales commissions, he frequently allowed return requests to remain unsigned on his desk for months, again postponing the day when the non-standard terms might be discovered.

18.    Besides Tatkow's authority over sales and returns, the improper accounting was made possible by significant flaws in ACIM's record-keeping system for processing orders. When a purchase order was received, ACIM's customer service department was supposed to enter all the terms, including non-standard ones, into ACIM's computer system. As a result, any non-standard terms were supposed to appear on the computer system when the order was acknowledged and when the order was invoiced. In reality, however, the customer service department sometimes failed to enter the non-standard terms into the computer system, with the result that many acknowledgments and invoices were issued without any indication that the distributor's obligation to pay was actually deferred or contingent.

8

19.    As a result of these inadequate internal controls and record-keeping processes, ACIM's controller and collections manager often learned about non-standard terms only when they were making collection calls to the distributors. By that point, of course, the revenue recognized from these transactions had already been on the books of ACIM (and thus Robotic) for several months.

## Non-Standard Deals Early in Fiscal Year 2000

20.    On December 15, 1999, a distributor in New Jersey ordered ACIM products worth more than $310,000. The purchase order stated, "If products cannot be sold within 90 days they can be returned (except [name of end user] if we secure blanket order)." Tatkow notified Cohen and Howes on December 17 that the order was for "general stocking needs" and that ACIM would "be paid within 30 days of when these units ship to their end users." On December 21, 1999, ACIM issued an order acknowledgment to the distributor confirming the right of return: "If product cannot be sold within 90 days they can be returned."

21.    On March 16, 2000, ACIM's controller sent an e-mail to Cohen, Howes and Tatkow entitled "Questionable Revenue". The controller stated, "Now that the quarter-end full court press is on again to make quarterly revenue projections I have some serious concerns about the wheeling and dealing that is going on." He explained that he had "recently discovered that $375k of revenue that was booked and shipped to [the New Jersey distributor] in Dec. & Feb. is really a consignment shipment (collection terms based on their customer ship dates)." He continued, "Larry [Cohen] tells me that this is a clear violation of accounting rules for revenue recognition." The next day, Cohen forwarded the controller's e-mail to Edwards and added his

9

own comment: "FYI – [the New Jersey distributor] shipments look like we may have an issue, unless terms are agreed to." Tatkow then defused the controversy by assuring Edwards and Cohen that the New Jersey deal was not on consignment.

22.    Robotic's second fiscal quarter ended on March 31, 2000. Just before the close of the quarter, Tatkow induced several distributors to order ACIM products by offering to defer their obligation to pay for the products.

23.    On March 28, 2000, a distributor in Wisconsin ordered ACIM products worth more than $115,000 after receiving a letter dated March 27, 2000 from Tatkow offering to postpone the distributor's obligation to pay until it sold the products to an end user: "As these systems are shipped to [the distributor's] end customers, payment to [Robotic] would be 30 days from the date these units are delivered to the end customer, not to exceed 90 days ARO [after receipt of order]." Tatkow also thanked the distributor "for your consideration toward helping us achieve our quarterly revenue objectives." ACIM's invoice noted that the payment terms were "per conditions set forth in letter from Mark Tatkow dated March 27, 2000." (The distributor returned most of the products in early 2001 for credit.)

24.    On March 30, 2000, a distributor in Michigan ordered ACIM products worth more than $150,000 after receiving an e-mail dated March 29, 2000 from Tatkow offering a full right to return any product that remained unsold after 120 days. (The distributor returned the entire order in early 2001 for credit.)

25.    On March 31, 2000, a second distributor in Michigan placed two orders for ACIM products. One order concerned products worth more than $75,000 which the distributor agreed to ship to a designated end user in exchange for a 5% handling fee. The other order concerned

10

products worth more than $100,000 for which the distributor was not required to pay until it sold

the product to end users. (The distributor returned a portion of the order in December 2000 for

credit.)

**The June 2000 Campaign to Sell MXi Readers**

26.    On May 31, 2000, Howes as Acting President of ACIM sent an "urgent" e-mail to

senior ACIM management, including Tatkow and Baker, concerning the need to generate an

additional $1.6 million in revenue by the end of the quarter (June 30). He wrote:

> We currently have $13.4M as our expected or forecasted revenue for
> the quarter. That is not good enough. We have to pull out all the
> stops. We need to get creative. We need to find a way to generate an
> additional $1.6M of revenue ...

Howes suggested that one way to generate the additional revenue was through a campaign to

promote sales of a new ACIM product, the MXi Hand Held Imager ("MXi"):

> Here's one idea -- we will have close to 600 MXi's that we can ship for
> revenue this quarter, some of them are forecasted and some are not ...
> We have relationships with distributors, systems integrators that we
> can go and ask for orders. We can cut some deals, but we also need to
> make some margin on the products.

27.    During June 2000, ACIM's sales staff, under the supervision of Howes and

Tatkow, arranged for three companies to act as regional distributors of the MXi. Each distributor

agreed to receive 250 MXi's for a total price of $525,000. Payment was ostensibly due within

ninety days, but in fact, the distributors were told that after ninety days, they could either return

the MXi's without penalty or, with ACIM's consent, extend the payment period.

28.    Defendant Baker personally negotiated the MXi transaction with the western

regional distributor in Washington. He sent the distributor an e-mail offering the same terms

11

made available to the other distributors who were going to purchase MXi's. He also proposed

that if the distributor could not store all 250 MXi's in its warehouse, it could choose to "ship in

place", meaning that ACIM would retain some of the MXi's at its facility until the distributor had

room for them. The distributor accepted Baker's proposal, taking 100 MXi's at once while

deferring shipment of the other 150 units until later.

29.    Just before the third fiscal quarter ended on June 30, 2000, ACIM invoiced these

three MXi deals, thereby generating $1,575,000 in revenue on Robotic's books. Although ACIM

recorded revenue from the deals, none of the distributors paid for the MXi's during the ninety-

day period. Instead, the distributors extended the payment terms, the MXi's remained unsold for

months, and two of the distributors eventually returned many of the MXi's for credit.

## Additional Non-Standard Deals in June 2000

30.    Besides the campaign to secure orders for MXi's by offering extended payment

terms and a free right of return, the ACIM sales staff negotiated other deals with similarly

generous non-standard terms before the third fiscal quarter ended on June 30, 2000.

31.    On June 22, 2000, the New Jersey distributor ordered ACIM products worth

almost $50,000 with a full right of return. Both the purchase order and ACIM's acknowledgment

explicitly mentioned the right of return. (In November 2000, the distributor returned many of the

items for credit.)

32.    On June 27, 2000, a distributor in Korea ordered ACIM products worth more than

$335,000 for delivery to an end user in Singapore. The purchase order made clear that the

12

distributor was not required to pay until it had received payment from the end user. (The distributor received credits for the items in the fall of 2000 and the spring of 2001.)

33.     On June 28, 2000, a distributor in Quebec ordered ACIM products worth more than $100,000 after receiving an e-mail dated June 22, 2000 from an ACIM sales representative and an e-mail dated June 28, 2000 from ACIM's eastern regional sales manager, both of which offered to delay shipment until the distributor received an order from its customer and also offered a full right of return if the order was never received. (The distributor returned the entire order in December 2000 for credit.)

34.     On June 29, 2000, a distributor in Michigan placed several orders for ACIM products worth more than $250,000 after receiving an e-mail dated June 28, 2000 from ACIM's central regional sales manager providing "details on four orders we would like you to place for immediate shipment." The e-mail also stated, "We need these placed ASAP so they can be shipped this week" (*i.e.*, before the end of the quarter). To induce the distributor to agree, the sales manager offered to defer the distributor's obligation to pay until it received orders from its customers and also offered the distributor a 5% handling fee for having placed the orders at ACIM's request.

## Edwards, Cohen and Howes Learn about
## Non-Standard Deals in late July 2000

35.     In early July 2000, ACIM's controller and collections manager began to investigate the recent MXi deals, in part because they had concerns that the MXi's had mechanical flaws and were not ready for shipment. They learned that the MXi's had already been shipped and, more importantly, that each of the purported MXi sales both deferred the

distributor's obligation to pay ACIM until it had sold the products to its end users and allowed
the distributor to return unsold products after ninety days.

36.    On July 26, 2000, ACIM's controller informed Cohen by e-mail that he had only
recently learned about the "ship in place" (also referred to as "bill and hold") component of the
MXi transaction with the Washington distributor. Under ACIM's procedures, the controller was
supposed to be informed of any "bill and hold" transactions, and all such transactions were to be
disclosed to Robotic's outside auditors at the end of each quarter. The controller also observed,
"Another looming issue we face in 4Q is the movement of MXi's out of the distribution pipeline.
If this doesn't happen we are faced with the possible return of units already in the pipeline."

37.    On July 27, 2000, Cohen notified Tatkow and Baker by e-mail that he had been
disturbed to learn on July 26 about the "bill and hold" deal with the Washington distributor,
especially because he and Edwards had "never reviewed the paperwork to validate that it was a
proper transaction."

38.    Later on July 27, 2000, Cohen met with Tatkow, ACIM's controller, and ACIM's
collections manager to discuss ACIM's largest accounts receivable. During the meeting, the
collections manager indicated that some of the accounts receivable reflected distributors who
claimed that they had a full right of return and did not have to pay ACIM until they had sold the
products to end users. After the meeting, the collection manager sent to Cohen a table listing
ACIM's largest accounts receivable. The list identified nearly $5 million due from ten
distributors and other customers. (As set forth below, the collections manager prepared similar
lists in the fall of 2000, and the lists became known within Robotic as "top 10 lists".)

14

39.     On July 28, 2000, Cohen sent an e-mail to Edwards, Howes, Tatkow and others entitled "Collection opportunities/issues at ACIM." He noted that ACIM's controller and collections manager were creating a list of outstanding accounts receivable, including "customers (mostly in distribution) unable/unwilling to pay until they turn over the product."

40.     Later on July 28, 2000, Cohen sent an e-mail to Howes about the MXi deal with the Washington distributor. Cohen stated, "The more I hear into [sic] this one, the more it looks like it is a revenue problem."

41.     On July 31, 2000, Cohen sent an e-mail to Edwards and Howes reporting on his conversation with a member of Robotic's Board of Directors in which the Board member stated that he had heard that ACIM had shipped MXi's to the Washington distributor with a 90-day right of return and that he was concerned that recognizing revenue from the transaction have been improper. Cohen stated in the e-mail, "I told him I was looking into that very same issue with you."

**Robotic's Materially Misleading Results**
**for the Quarter Ended June 30, 2000**

42.     During the third fiscal quarter (ended June 30, 2000), ACIM generated approximately $1.97 million in purported sales, including $1,575,000 in deals for the new MXi's and the other deals set forth above, by offering non-standard terms that deferred, conditioned or eliminated the distributor's obligation to pay. Even though the distributor had no immediate obligation to pay, ACIM recognized revenue on each of these deals as soon as the products left the ACIM warehouse.

15

43.     By the end of July 2000, as set forth above, defendants knew or were reckless in
not knowing that ACIM had entered into at least one deal (the MXi deal with the Washington
distributor) in which revenue recognition might not have been justified because the distributor
had received a full right of return, and that ACIM had extended the same terms to the other two
distributors who had agreed to take MXi's at the end of June 2000.  Nevertheless, defendants did
not correct the improper accounting and did not notify Robotic's Board of Directors, Audit
Committee, or outside auditors about the revenue recognition problem.

44.     On August 12, 2000, Robotic filed a quarterly report to the Commission on
Form 10-Q.  The Form 10-Q, which was signed by Edwards as CFO, reported that, for the third
fiscal quarter (ended June 30), Robotic's revenues were approximately $63.3 million and its net
income was approximately $5.8 million.  These quarterly results were materially misleading
because they included the revenue which had been recognized on the non-standard ACIM deals
described above.

## Additional Non-Standard Deals before the
## Fiscal Year Ended on September 30, 2000

45.     On September 7, 2000, ACIM's controller sent an e-mail to Edwards and Cohen
informing them that he had asked his staff to flag all orders with terms longer than sixty days.
He added, "In the past we have given terms of net XX days after the product has been sold.
These terms are no longer acceptable."  Nevertheless, in late August and throughout September
2000, the ACIM sales staff acting under Tatkow's supervision continued to enter into deals with
non-standard terms that effectively deferred or eliminated the distributor's obligation to pay.

16

Further, Tatkow and the sales staff continued to withhold information about the non-standard terms from ACIM's controller.

46.     On August 29, 2000, a distributor in Michigan placed two orders for ACIM products, each worth more than $21,000. In each instance, both the purchase order and ACIM's order acknowledgment explicitly stated that the products were on a 60-day consignment to a specified end user. In addition, both ACIM invoices stated that the distributor had a full right of return.

47.     On September 6, 2000, the Washington distributor ordered ACIM products worth $125,000 after receiving an e-mail dated September 2, 2000 from Baker in which he offered "almost" the same terms as the distributor had received for the MXi order in June (*i.e.*, payment deferred until ninety days after sale to an end user and a full right to return unsold items). Baker explained:

> The "almost" part of what I am referring to is that in your p.o.
> [purchase order] to us you cannot state that you have the right
> to return the product at no cost at any time. When you do that
> we can't book the order as revenue. You and I agree that is
> what we can do and you now have this e-mail to hold and
> confirm that action in the future if you need to. Please make
> sure that it does not say that on the order.

The distributor accepted Baker's proposal, and its purchase order omitted any reference to the right of return. On September 15, 2000, Baker copied Howes on an e-mail to the distributor confirming that it had a full right to return the product covered by this order.

48.     On September 13, 2000, a distributor in Louisiana ordered ACIM products worth more than $195,000 with a full right of return. ACIM's order acknowledgment and invoice both

explicitly mentioned the right of return. (The distributor returned the entire order in early 2001 for credit.)

49.    On September 18, 2000, the New Jersey distributor ordered ACIM products worth more than $240,000 with a full right of return. The purchase order explicitly mentioned the right of return.

50.    On September 20, 2000, the same distributor placed several orders for a variety of ACIM products worth a total of nearly $230,000 in response to an e-mail dated September 19, 2000 from ACIM's central regional sales manager offering a full right of return plus a 5% handling fee: "In all cases the terms will be 60 days and should the customers fail to place their orders you may return the equipment without a restocking penalty. Upon customer placement of the respective orders you will be given shipping instructions and receive a credit on your account of 5% more than the value of the individual order you placed with us for the shipment." (The distributor returned many of the items in late 2000 for credit.)

51.    On September 26, 2000, a distributor in Michigan ordered ACIM products worth more than $53,000 with a full right of return as offered by ACIM's central regional sales manager. The ACIM order acknowledgment and invoice explicitly mentioned the right of return.

52.    On September 28, 2000, the New Jersey distributor ordered ACIM products worth more than $344,000. The order consisted of products which ACIM had intended to ship to an end user in New York, but the end user was not ready to submit its purchase order before the quarter was to end on September 30, 2000. To get an order on ACIM's books before the end of the quarter, the ACIM sales staff arranged for the New Jersey distributor to place the order. The distributor received a full right to return the product if the end user never placed its order, and the

18

distributor was also given a 3% handling fee. (The end user eventually placed its order in
November 2000, and the distributor received credit.)

53.     On September 29, 2000, a second distributor in Michigan ordered ACIM products
worth more than $60,000 with a full right of return as promised by Tatkow and ACIM's central
regional sales manager. The purchase order explicitly mentioned the right of return.

54.     Altogether, during the fourth fiscal quarter of 2000 (ended September 30),
Robotic improperly recorded revenue from sixteen deals totaling $2.1 million in which, as in the
deals described above, the distributor's obligation to pay was deferred, contingent, or even non-
existent.

**Edwards, Cohen and Howes Learn about**
**Non-Standard Deals in October and November 2000**

55.     On September 28, 2000, Cohen circulated to Edwards, Howes and many others a
written revenue recognition policy for Robotic. The policy, which did not change the unwritten
policy previously in place, explicitly stated that Robotic would recognize revenue upon shipment
*only* if collection were "reasonably assured" and *not* when the customer "has the right to return
the product" or when the customer's payment "is contingent on the resale of the product."

56.     Edwards told Howes and senior ACIM management to adhere to the written
revenue recognition policy. Nevertheless, ACIM recognized revenue from non-standard deals
negotiated in August and September 2000 even though such accounting treatment was
inconsistent with both the new written policy and the prior unwritten policy.

57.     On October 12, 2000, ACIM's collections manager prepared a revised "top 10
list" of the largest accounts receivable. The list, attached to an email sent to Cohen and to

19

ACIM's controller, identified more than $6.5 million due from fifteen distributors and customers. For the first time, the list included comments identifying reasons for non-payment. Many of the comments disclosed the deferred or contingent nature of the distributor's obligation to pay. For example, the list stated that the New Jersey distributor owed more than $1.5 million for which the terms were "net 90 days – net 30 days after sold". A similar comment ("net 90 days after sale") appeared for several other receivables, including the $651,000 due from the Washington distributor and the $800,000 due from one of the Michigan distributors. The note for the other Michigan distributor, which owed $551,000, stated, "Hold and ship when we secure P/O." The note for another distributor, which owed $239,000, stated, "Net 30 days after securing P/O from their customer." The note for the Louisiana distributor, which owed $197,000, stated, "Holding product for third party." As a result of these comments, anyone reviewing the October 12, 2000 version of the "top 10 list" was on notice that the distributors may have received non-standard terms that deferred or eliminated their obligation to pay.

58. During October and November 2000, Edwards and Cohen had discussions concerning the prospects for collecting ACIM's receivables with ACIM's controller and collections manager. The controller and collections manager discussed the non-standard terms identified on the "top ten list."

59. On November 2, 2000, ACIM's collections manager circulated a revised "top 10 list" which identified more than $6.1 million due from eighteen distributors and customers. The list contained virtually the same comments about the deferred or contingent nature of many receivables that had appeared on the October 12, 2000 version of the list.

60.    On November 29, 2000, ACIM's controller circulated yet another "top 10 list" which identified nearly $8 million due from nineteen distributors and customers. The list contained virtually the same comments about deferred or contingent obligations that had appeared on the October 10 and November 2 versions of the list. Edwards discussed ACIM's receivables with ACIM senior management, including Howes and Tatkow, as well as ACIM's controller and collections manager. The controller and collections manager explained the comments about each receivable on the "top 10 list."

61.    On November 30, 2000, Tatkow sent an e-mail to his sales managers asking them to compile further information about ACIM's receivables. Reflecting his awareness of the deals with non-standard terms were not real sales, he instructed them, "Break down each 'bucket,' explaining what is a legitimate receivable and what is a 'channel stuffing' order, unlikely to get paid for some time."

**Edwards' and Cohen's Dealings with  Robotic's Outside Auditors**

62.    Edwards as Robotic's CFO and Cohen as its Controller had substantial involvement with the company's outside auditors. By at least October 2000, both Edwards and Cohen knew or were reckless in not knowing, through the e-mails and meetings discussed above, through conversations with ACIM's controller and collections manager, and through the "top 10 lists" of ACIM's outstanding receivables, that many distributors were responding to ACIM's pressure for payment by claiming to have received non-standard terms that deferred or even eliminated their obligation to pay ACIM. As a result, both Edwards and Cohen knew or were reckless in not knowing that recognizing revenue from these non-standard deals was inconsistent

21

with Robotic's revenue recognition policy and with GAAP, and yet failed to disclose such matters to Robotic's outside auditors.

63.    In addition, Edwards and Cohen both signed Robotic's management representation letter to the auditors for the fiscal year 2000. The letter, which was dated November 1, 2000, stated that Robotic had "fully disclosed [to the auditors] all sale terms, including all rights to return or price adjustments and all warranty provisions."

**Robotic's Materially Misleading Annual Report**
**for the Fiscal Year 2000 (Ended September 30, 2000)**

64.    On November 2, 2000, Robotic announced record revenues for the fiscal year ended September 30, 2000 of $227.9 million, net income of $12.1 million, and earnings per share of $0.31.

65.    On December 28, 2000, Robotic filed its annual report to the Commission on Form 10-K. The Form 10-K, which was signed by Edwards as CFO, reported the same revenue, income and earnings figures as the November 2, 2000 announcement.

66.    The financial results announced on November 2, 2000 and included in the annual report filed on December 28, 2000 were materially misleading because they included the revenue which had been improperly recognized on the non-standard deals described above.

**Robotic's Restatement of its Fiscal Year 2000 Results**

67.    In late January 2001, Robotic's outside auditor partner discovered that the confirmation from one of the Michigan distributors included several side letters, one of which identified the distributor's right to return the 250 MXi's ordered in June 2000.

68.    Beginning in early February 2001, Robotic's senior management and the outside auditors conducted an internal investigation which revealed the large number of non-standard deals with ACIM's distributors.

69.    On May 15, 2001, Robotic announced its intention to restate its financial results for the third fiscal quarter of 2000 and for the fiscal year 2000. As a result of the restatement, Robotic reduced its third quarter revenue to $61.2 million and its net income to $5.3 million, thus disclosing that it had overstated its third quarter revenues by 3.4% ($2.1 million) and its net income by 9.7% ($517,000). Similarly, Robotic reduced its annual revenue to $223.1 million, its net income to $10.7 million, and its earnings per share to $0.27, thus disclosing that it had overstated its annual revenues by 2.1% ($4.74 million) and its net income by 13.5% ($1.45 million).

## FIRST CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 by Edwards)

70.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-69 of the Complaint as if set forth fully herein.

71.    Robotic filed a materially misleading Form 10-Q for the third fiscal quarter of 2000 and a materially misleading Form 10-K for the fiscal year 2000. Edwards as Robotic's CFO signed both of the materially misleading filings with the Commission. As set forth above, he knew or was reckless in not knowing that these filings were materially misleading.

72.    By reason of the foregoing, Edwards, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes or

artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including purchasers or sellers of Robotic's securities.

73.    As a result, Edwards violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and his violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

## SECOND CLAIM FOR RELIEF
### (Violation of Section 10(b) of the Exchange Act and Rule 10b-5 or, in the alternative, Aiding and Abetting Robotic's Violation of Section 10(b) of the Exchange Act and Rule 10 b-5, by Cohen)

74.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-73 of the Complaint as if set forth fully herein.

75.    Robotic filed a materially misleading Form 10-Q for the third fiscal quarter of 2000 and a materially misleading Form 10-K for the fiscal year 2000. Cohen as Robotic's Controller was responsible for consolidating the financial information from the company's divisions and consolidating that information into the company's filings with the Commission. As set forth above, he knew or was reckless in not knowing that Robotic's Form 10-Q for the third fiscal quarter of 2000 and its Form 10-K for the fiscal year 2000 were materially misleading.

24

76.    By reason of the foregoing, Cohen, directly or indirectly, acting intentionally, knowingly or recklessly, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated as a fraud or deceit upon certain persons, including purchasers or sellers of Robotic's securities. In the alternative, Cohen provided knowing and substantial assistance to Robotic's materially misleading public filings, and he knew or was reckless in not knowing that the improper revenue recognition at ACIM would render Robotic's public filings materially misleading.

77.    As a result, Cohen violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], and his violation involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)]. In the alternative, Cohen aided and abetted Robotic's violations of Section 10(b) of the Exchange Act and Rule 10b-5.

## THIRD CLAIM FOR RELIEF
### (Aiding and Abetting Robotic's Violations of Section 10(b) of the Exchange Act and Rule 10b-5 by Howes, Tatkow and Baker)

78.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-77 of the Complaint as if set forth fully herein.

79.    Robotic filed a materially misleading Form 10-Q for the third fiscal quarter of
2000 and a materially misleading Form 10-K for the fiscal year 2000. As a result, Robotic
violated Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17
C.F.R. §240.10b-5].

80.    Howes was ACIM's Acting President. As set forth above, he knew or was
reckless in not knowing that ACIM had improperly recognized revenue from purported sales in
which distributors had received non-standard terms that deferred or eliminated their obligation to
pay.

81.    Tatkow was ACIM's Senior Vice President of Worldwide Sales. He had the
power to approve non-standard terms and to authorize product returns at ACIM. As set forth
above, he knew or was reckless in not knowing that ACIM had improperly recognized revenue
from purported sales in which the distributors had received non-standard terms that deferred or
eliminated their obligation to pay.

82.    Baker was the General Manager of ACIM's 2D unit during the relevant period.
As set forth above, he negotiated two deals with the Washington distributor which provided the
distributor with a full right of return. In connection with the second deal, he specifically asked
the distributor in an e-mail dated September 2, 2000 to omit any reference to the right of return
from its purchase order so that ACIM (and thus Robotic) would be able to recognize revenue
from the transaction.

83.    By reason of the foregoing, Howes, Tatkow, and Baker each provided knowing
and substantial assistance to Robotic's filing of materially misleading reports to the Commission.

26

84.    As a result, Howes, Tatkow and Baker each aided and abetted Robotic's

violations of Section 10(b) of the Exchange Act and Rule 10b-5.

## FOURTH CLAIM FOR RELIEF
### (Violation of Section 13(b)(5) of the Exchange Act and Rule 13b2-1 by All Defendants)

85.    The Commission repeats and incorporates by reference the allegations in

paragraphs 1-84 of the Complaint as if set forth fully herein.

86.    Edwards as Robotic's CFO was generally responsible for ensuring that the

company had adequate internal controls. As set forth above, he knew, or was reckless in not

knowing, that Tatkow had the power to approve non-standard terms and to authorize product

returns at ACIM, and by permitting Tatkow to have such authority, he eliminated the segregation

of duties, a principle that is fundamental to proper internal controls. For most of the fiscal year

2000, he failed to ensure that Robotic had in place a written revenue recognition policy (with the

exception of its bill and hold policy). During this period, he was alerted to improper revenue

recognition at ACIM which he knew or was reckless in not knowing resulted in inaccurate books

and records. Nevertheless, he failed to ensure that the inaccurate books and records were

corrected.

87.    Cohen as Robotic's Controller was specifically responsible for ensuring the

adequacy of the internal accounting controls at the company's divisions. As set forth above, he

knew that Tatkow had the power to approve non-standard terms and to authorize product returns

at ACIM, and by permitting Tatkow to have such authority, he eliminated the segregation of

duties, a principle fundamental to proper internal controls. For most of the fiscal year 2000, he

27

failed to ensure that Robotic had in place a written revenue recognition policy (with the exception of its bill and hold policy). During this period, he was alerted to improper revenue recognition at ACIM which he knew or was reckless in not knowing resulted in inaccurate books and records. Nevertheless, he failed to ensure that the inaccurate books and records were corrected.

88.    Howes was ACIM's Acting President. As set forth above, he knew that Tatkow had the power to approve non-standard terms and to authorize product returns at ACIM, and by permitting Tatkow to have such authority, he eliminated the segregation of duties, a principle fundamental to proper internal controls. During this period, he was alerted to improper revenue recognition at ACIM which he knew or was reckless in not knowing resulted in inaccurate books and records. Nevertheless, he failed to ensure that the inaccurate books and records were corrected.

89.    Tatkow as ACIM's Senior Vice President of Worldwide Sales had certain authority by superiors to approve non-standard terms and to authorize product returns at ACIM. As set forth above, he knew or was reckless in not knowing that ACIM's controller was not being informed about the non-standard terms that he had negotiated or approved. Beginning as early as December 1999, and especially during the period from late July through November 2000, he was alerted to improper revenue recognition at ACIM which he knew or was reckless in not knowing resulted in inaccurate books and records. Nevertheless, he failed to ensure that the inaccurate books and records were corrected.

90.    Baker was the General Manager of ACIM's 2D unit during the relevant period. As set forth above, he negotiated two deals with the Washington distributor which provided the

28

distributor with a full right of return. When negotiating the second deal, he specifically asked the distributor to omit any reference to the right of return from its purchase order so that ACIM (and thus Robotic) would be able to recognize revenue from the transaction.

91.    By reason of the foregoing, Edwards, Cohen, Howes, Tatkow and Baker knowingly circumvented Robotic's system of internal accounting controls and, directly or indirectly, falsified or caused to be falsified Robotic's books, records and accounts.

92.    As a result, Edwards, Cohen, Howes, Tatkow and Baker violated Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1], and their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

### FIFTH CLAIM FOR RELIEF
### (Violation of Exchange Act Rule 13b2-2
### by Edwards, Cohen and Tatkow)

93.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-92 of the Complaint as if set forth fully herein.

94.    Edwards was Robotic's CFO and Cohen was its Controller. In connection with the fiscal year 2000 audit, they signed a management representation letter dated November 1, 2000 stating that Robotic had "fully disclosed [to the auditors] all sale terms, including all rights to return or price adjustments and all warranty provisions."

95.    Tatkow was ACIM's Senior Vice President of Worldwide Sales. As set forth above, he had certain authority to approve non-standard terms and to authorize product returns at

29

ACIM. He knew or was reckless in not knowing that ACIM's controller was not being informed about the non-standard terms that he had negotiated or approved.

96.    By reason of the foregoing, Edwards, Cohen and Tatkow violated Rule 13b2-2 promulgated under the Exchange Act [17 C.F.R. §240.13b2-2], which provides that no director or officer of an issuer shall, directly or indirectly, make or cause to be made a materially false or misleading statement, or omit to state, or cause another person to omit to state, any material fact necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading, to an accountant in connection with (I) an audit or examination of the financial statements of an issuer required to be made or (ii) the preparation or filing of a document or report required to be filed with the Commission.

97.    As a result, their violations involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements and resulted in substantial losses or significant risk of substantial losses to other persons, within the meaning of Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)].

**SIXTH CLAIM FOR RELIEF**
**(Aiding and Abetting Robotic's Violations of Section 13(a) of the**
**Exchange Act and Rules 12b-20, 13a-1 and 13a-13 by All Defendants)**

98.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-97 of the Complaint as if set forth fully herein.

99.    At all relevant times, Robotic was required by Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1 and 240.13a-13] to file with the Commission annual reports on Form 10-K and

30

quarterly reports on Form 10-Q that contained such material information as necessary to make the required statements, in the light of the circumstances under which they were made not misleading.

100.    As set forth above, Robotic's quarterly report to the Commission on Form 10-Q for the third fiscal quarter of 2000 (ended June 30) and its annual report to the Commission on Form 10-K for the fiscal year 2000 (ended September 30) materially misstated the company's financial results. As a result, Robotic violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.

101.    As set forth above, Edwards signed Robotic's materially misleading Form 10-Q and Form 10-K, while Cohen, Howes, Tatkow and Baker substantially participated in both materially misleading public filings.

102.    By reason of the foregoing, Edwards, Cohen, Howes, Tatkow and Baker provided knowing and substantial assistance to Robotic's filing of materially misleading financial reports.

103.    As a result, Edwards, Cohen, Howes, Tatkow and Baker each aided and abetted Robotic's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1 and 13a-13.

### SEVENTH CLAIM FOR RELIEF
#### (Aiding and Abetting Robotic's Violations of Section 13(b)(2)(A) of the Exchange Act by All Defendants)

104.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-103 of the Complaint as if set forth fully herein.

105.    At all relevant times, Robotic was required by Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)] to make and keep books, records and accounts which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

106.    As set forth above, Robotic maintained false and misleading books, records and accounts which, among other things, materially overstated the company's revenue and income for the third fiscal quarter of 2000 and the fiscal year 2000. As a result, Robotic violated Section 13(b)(2)(A) of the Exchange Act.

107.    As set forth above, Edwards, Cohen, Howes, Tatkow and Baker provided knowing and substantial assistance to the improper accounting practices at ACIM (and thus Robotic).

108.    As a result, Edwards, Cohen, Howes, Tatkow and Baker each aided and abetted Robotic's violations of Section 13(b)(2)(A) of the Exchange Act.

### EIGHTH CLAIM FOR RELIEF
#### (Aiding and Abetting Robotic's Violations of Section 13(b)(2)(B) of the Exchange Act by Edwards, Cohen and Howes)

109.    The Commission repeats and incorporates by reference the allegations in paragraphs 1-108 of the Complaint as if set forth fully herein.

110.    At all relevant times, Robotic was required by Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)] to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP.

32

111.    As set forth above, Robotic's system of internal accounting controls was not sufficient to provide reasonable assurances that transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP. As a result, Robotic violated Section 13(b)(2)(B) of the Exchange Act.

112.    As set forth above, Edwards, Cohen and Howes failed to ensure that ACIM (and thus Robotic) was properly recognizing revenue from transactions with its distributors.

113.    By reason of the foregoing, Edwards, Cohen and Howes provided knowing and substantial assistance to the absence of a system of internal accounting controls sufficient to provide reasonable assurances that transactions at ACIM (and thus Robotic) were recorded as necessary to permit preparation of financial statements in conformity with GAAP.

114.    As a result, Edwards, Cohen and Howes each aided and abetted Robotic's violations of Section 13(b)(2)(B) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A.    Enter a permanent injunction restraining Edwards, Cohen, Howes, Tatkow and Baker and each of their respective agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in violations of:

          1.    Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5];

33

2.    Section 13(b)(5) of the Exchange Act [15 U.S.C. §78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. §240.13b2-1];

3.    Section 13(a) of the Exchange Act [15 U.S.C. §78m(a)] and Rules 12b-20, 13a-1 and 13a-13 thereunder [17 C.F.R. §§240.12b-20, 240.13a-1 and 240.13a-13];

4.    Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. §78m(b)(2)(A)];

5.    as to Edwards, Cohen and Howes only, Section 13(b)(2)(B) of the Exchange Act [15 U.S.C. §78m(b)(2)(B)];

6.    Exchange Act Rule 13b2-1 [17 C.F.R. §240.13b2-1]; and

7.    as to Edwards, Cohen and Tatkow only, Exchange Act Rule 13b2-2 [17 C.F.R. §240.13b2-2];

B.    Order Howes, Tatkow and Baker to disgorge the performance bonuses they received on the basis of the materially overstated revenue at ACIM, plus pre-judgment interest;

C.    Order each defendant to pay an appropriate civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)];

D.    Enter an order, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §78u(d)(2)], barring Edwards and Cohen from serving as an officer or director of any issuer required to file reports with the Commission pursuant to Sections 12(b), 12(g) or 15(d) of the Exchange Act [15 U.S.C. §§78l(b), 78l(g) and 78o(d)];

E.    Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

F.    Award such other and further relief as the Court deems just and proper.

34

Respectfully submitted,

**SECURITIES AND EXCHANGE COMMISSION**

By its Attorneys,

Frank C. Huntington (Mass. Bar No. 544045)
Asita Obeyesekere (D.C. Bar No. 451637)
Securities and Exchange Commission
73 Tremont Street, 6th Floor
Boston, MA  02108
(617) 573-8960  (Huntington)
(617) 573-8977  (Obeyesekere)
(617) 424-5940  (fax)
huntingtonf@sec.gov

Dated: November 18, 2004

35

**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

1. Title of case (name of first party on each side only) SEC v. Baker et al.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

☐ I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

☒ II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.
  *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

☐ III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

☐ IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

☐ V. 150, 152, 153.

*04 12444 DPW*

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?
   YES ☐   NO ☒

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest?   (See 28 USC §2403)
   YES ☐   NO ☒
   If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?
   YES ☐   NO ☐

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?
   YES ☐   NO ☒

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).
   YES ☐   NO ☒
   A. If yes, in which division do all of the non-governmental parties reside?
      Eastern Division ☐      Central Division ☐      Western Division ☐
   B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?
      Eastern Division ☐      Central Division ☐      Western Division ☐

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)
   YES ☐   NO ☐

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME   Frank C. Huntington

ADDRESS   Securities and Exchange Commission, 73 Tremont St., Suite 600, Boston, MA  02108

TELEPHONE NO.   (617) 573-8960

(Coversheetlocal.wpd - 10/17/02)

JS 44
(Rev. 3/99)

# CIVIL COVER SHEET

The JS–44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

SECURITIES AND EXCHANGE COMMISSION

## DEFENDANTS

WILLIAM BAKER, LAURENCE COHEN, FRANK EDWARDS, CURTIS HOWES, MARK PATKO

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _____
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT   Worcester
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

Frank C. Huntington, Esq.
Securities and Exchange Commission
73 Tremont St., Suite 600
Boston, MA  02108     (617) 573-8960

ATTORNEYS (IF KNOWN)

## II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY)

☒ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government
Defendant

☐ 4  Diversity
(Indicate Citizenship of Parties
in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN "X" IN ONE BOX FOR PLAINTIFF
(For Diversity Cases Only)                       AND ONE BOX FOR DEFENDANT)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury — Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 423 Withdrawal 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | | **PERSONAL PROPERTY** | ☐ 650 Airline Regs | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 830 Patent | ☒ 810 Selective Service |
| | ☐ 345 Marine Product Liability | ☐ 371 Truth in Lending | ☐ 690 Other | ☐ 840 Trademark | ☒ 850 Securities/Commodities/Exchange |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| ☐ 195 Contract Product Liability | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | | **FEDERAL TAX SUITS** | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/Accommodations | ☐ 530 General | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 950 Constitutionality of State Statutes |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | | |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 871 IRS – Third Party 26 USC 7609 | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |

## V. ORIGIN (PLACE AN "X" IN ONE BOX ONLY)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE
DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

Violations of Sections 10(b), 13(a) and 13(b) of the Securities Exchange Act of 1934
[15 U.S.C. Section 78].

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ YES   ☐ NO

## VIII. RELATED CASE(S)
IF ANY     (See instructions):

JUDGE _____          DOCKET NUMBER _____

DATE   11/18/04

SIGNATURE OF ATTORNEY OF RECORD   Frank C Huntington

FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____